# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

**UNITED STATES OF AMERICA** *ex rel.*
**ERIC M. SHAPIRO**
19300 Middletown Rd.
Parkton, MD 21120

       *Relator,*

   *v.*

**SAMER SAIEDY**
1212 York Rd. Ste. B201
Lutherville, MD 21093

**SAMER SAIEDY, M.D., P.A. d/b/a
MARYLAND VASCULAR
SPECIALISTS**
1212 York Rd. Ste. B201
Lutherville, MD 21093

**HYPERHEAL HYPERBARICS, INC.
d/b/a MVS WOUND CARE AND
HYPERBARICS**
7600 Osler Dr. Ste. 305
Towson, MD 21204

**PODIATRY ASSOCIATES, P.A.**
One North Main St.
Bel Air, MD 21014

**PODIATRY ASSOCIATES
AMBULATORY SURGICAL CENTER,
LLC**
6569 North Charles St. Ste. 702
Towson, MD 21204

       *Defendants.*

Case No. 21-CV-3152-GLR

**FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**JURY TRIAL DEMANDED**

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2021 DEC 10 PM 4: 04

CLERK'S OFFICE
AT BALTIMORE

BY _____ DEPUTY

## *QUI TAM* COMPLAINT

Relator Eric Shapiro, on behalf of himself and the United States of America, hereby alleges as follows against Defendants Samer Saiedy ("Dr. Saiedy"), Samer Saiedy, M.D., P.A. d/b/a Maryland Vascular Specialists ("Maryland Vascular Specialists"), Hyperheal Hyperbarics, Inc. d/b/a MVS Wound Care and Hyperbarics ("MVS Wound Care"), Podiatry Associates, P.A. ("MVS Podiatry"), and Podiatry Associates Ambulatory Surgical Center, LLC ("MVS Podiatry ASC") (collectively, "Defendants"):

## PRELIMINARY STATEMENT

1.    From 2013 to today (the "Covered Period"), Dr. Saiedy has orchestrated a scheme to enrich himself and his businesses through fraudulent self-referrals between the medical companies in which he has an ownership interest, referred to in this Complaint as the MVS Entities or, collectively, as the MVS Network.[1]

2.    When patients are seen by doctors within the MVS Network, the doctors (including Dr. Saiedy himself) often refer them to another practice within the MVS Network in violation of federal law.

3.    Dr. Saiedy has induced physicians employed by the MVS Network to make these self-referrals by offering bonuses based on the volume of patients referred.  He also has threatened them with retaliation if they refuse to refer patients internally.

4.    Dr. Saiedy has hidden this scheme by directing his employees to alter the patients' medical records to make it appear as they were referred by their primary care providers, and never to list Dr. Saiedy as the referring doctor for referrals that Dr. Saiedy has made.

---

[1] Those companies include at least Maryland Vascular Specialists, MVS Wound Care, MVS Podiatry, and the MVS Podiatry ASC.

5.      These self-referrals are regularly made without regard to whether the patients actually need a referral at all.  Dr. Saiedy simply uses the existence of his network of medical practices to bill for unnecessary medical services and procedures.

6.      Furthermore, these self-referrals also allow Defendants to bill for their services at higher rates than they would be able to obtain without the referrals.  For example, if a patient seen by Maryland Vascular Specialists needs a medical treatment, Defendants may refer that patient to the ambulatory surgical center within the MVS Network, where that procedure can be billed at a higher rate, despite the fact that the service could have been performed for a lower price at Maryland Vascular Specialists.

7.      Relator has personally witnessed these referrals, and also has knowledge of the scheme from admissions that Dr. Saiedy directly shared with him in one-on-one conversations.  Furthermore, former employees of the MVS Entities have confirmed the existence of this scheme, including through providing under oath in testimony and affidavits in proceedings unrelated to this action.

8.      The fraudulent scheme alleged herein runs far afoul of the Stark Law, 42 U.S.C. § 1395nn, which prohibits physicians from referring patients to entities with which the physician (or his or her family member) has a financial relationship, including an ownership interest.  Dr. Saiedy's bonuses to MVS Network physicians based on their volume of referrals also violates the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b)(2), which prohibits offering remuneration to induce someone to make medical referrals.  Compliance with these laws is a material condition for payment by Medicare pursuant to the False Claims Act, 31 U.S.C. §§ 3729 et seq. ("FCA").

9.     Dr. Saiedy's and the MVS Entities' submission to the federal government of claims for payment for services rendered in violation of the Stark Law and the AKS therefore constitute violations of the FCA.

10.     As alleged below, Relator estimates that Defendants have billed more than $50 million to the federal government pursuant to this fraudulent scheme.

11.     Relator seeks to remedy these violations of law through this *qui tam* lawsuit.

**JURISDICTION AND VENUE**

12.     This is a civil action arising under the laws of the United States to redress violations of the FCA, 31 U.S.C. §§ 3729, *et seq.* This Court has jurisdiction over the subject matter of this action pursuant to 31 U.S.C. § 3732, which confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730; and 28 U.S.C. § 1331, which confers federal subject matter jurisdiction over civil actions arising under the laws of the United States.

13.     This Court has personal jurisdiction over each of the Defendants under 31 U.S.C. § 3732(a) because each of them can be found in, is authorized to transact business in, and/or is now transacting business in the District of Maryland. In addition, acts proscribed by 31 U.S.C. § 3729 that are the subject of this lawsuit have occurred in this District.

14.     Venue is proper in the District of Maryland pursuant to 31 U.S.C. § 3732(a) because one or more of the Defendants conducts business in this District and because one or more acts proscribed by 31 U.S.C. §§ 3729 et seq. occurred in this District.

15.     This case is properly filed in the Northern Division of this Court because all of the parties reside in the Northern Division.

3

## PARTIES

16.     Relator Eric M. Shapiro is a citizen and resident of Baltimore County, Maryland. He is the founder of Hyperheal Hyperbarics, Inc. (now called MVS Wound Care), but has not been involved in the business since 2018.

17.     Defendant Samer Saiedy is a physician who is a citizen and resident of Baltimore County, Maryland. Dr. Saiedy has an ownership interest in all of the MVS Entities.

18.     Defendant Samer Saiedy, M.D., P.A. d/b/a Maryland Vascular Specialists is a professional association organized under the laws of the State of Maryland, with its corporate headquarters and principal place of business located at 1212 York Rd. Ste. B201, Lutherville, Maryland 21093.

19.     Defendant Hyperheal Hyperbarics, Inc. d/b/a MVS Wound Care and Hyperbarics is a corporation organized under the laws of the State of Maryland, with its corporate headquarters and principal place of business located at 7600 Osler Dr. Ste. 305, Towson, Maryland 21204. Relator founded Hyperheal Hyperbarics, Inc., but it eventually came under the control of Dr. Saiedy in or around June of 2015, and it was given the trade name of MVS Wound Care and Hyperbarics in or around June 2020.

20.     Defendant Podiatry Associates, P.A. is a professional association organized under the laws of the State of Maryland, with its corporate headquarters and principal place of business located at One North Main St., Bel Air, Maryland 21014. Dr. Saiedy acquired Podiatry Associates, P.A. in or around 2019.

21.     Defendant Podiatry Associates Ambulatory Surgical Center, LLC is a limited liability company organized under the laws of the State of Maryland, with its corporate headquarters and principal place of business located at 6569 North Charles St. Ste. 702, Towson,

4

Maryland 21204. It is affiliated with Defendant MVS Podiatry, and is advertised on MVS Podiatry's website as one of MVS Podiatry's locations.[2]

## APPLICABLE STATUTES AND REGULATIONS

22.     The FCA subjects to civil liability any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the federal government, "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," or conspires to do so. 31 U.S.C. § 3729(a)(1)(A)-(C). "Knowingly" is defined to include actual knowledge, reckless disregard and deliberate indifference. 31 U.S.C. § 3729(b)(l).

23.     When a medical provider knowingly violates material statutory or regulatory requirements that provider's claims for payment to federal healthcare programs violate the FCA.

24.     One such legal requirement is imposed by the Physician Self-Referral Law, commonly referred to as the Stark Law. The Stark Law prohibits medical providers from submitting claims for certain "designated health services" if those services were furnished pursuant to referrals from physicians with which the entities had a "financial relationship." 42 U.S.C. § 1395nn(a)(1). The goal of the statute is to "to curb overutilization of services by physicians who could profit by referring patients to facilities in which they have a financial interest." See Jo-Ellyn Sakowitz Klein, *The Stark Laws: Conquering Physician Conflicts of Interest?*, 87 Geo. L.J. 499, 511 (1998).

25.     The Stark Law also prohibits physicians from directing others to make referrals to entities with a financial relationship to those physicians. Specifically, "a referral made by a physician's group practice, its members, or its staff may be imputed to the physician if the

---

[2] https://podiatryassociates.org/locations/.

physician directs the group practice, its members, or its staff to make the referral or if the physician controls referrals made by his or her group practice, its members, or its staff." 42 C.F.R. § 411.353(a).

26.     A "financial relationship" giving rise to the Stark Law's prohibition on referrals includes "an ownership or investment interest," whether "through equity, debt, or other means and includes an interest in an entity that holds an ownership or investment interest in any entity providing" the health services at issue. 42 U.S.C. § 1395nn(a)(2). For example, the website for the Department of Health and Human Services ("HHS") explains that "if you invest in an imaging center," then, absent some exception, the Stark Law means that "you may not refer patients to the facility and the entity may not bill for the referred imaging services."[3]

27.     "Designated health services" under the Stark Law means: clinical laboratory services; physical therapy services; occupational therapy services; radiology services, including magnetic resonance imaging, computerized axial tomography scans, and ultrasound services; radiation therapy services and supplies; durable medical equipment and supplies; parenteral and enteral nutrients, equipment, and supplies; prosthetics, orthotics, and prosthetic devices and supplies; home health services; outpatient prescription drugs; inpatient and outpatient hospital services; or outpatient speech-language pathology services. 42 U.S.C § 1395nn(h)(6).

28.     The Stark Law contains an exception for physicians' services provided personally by another physician in the same group practice as the referring physician. 42 U.S.C. § 1395nn(b)(1). Certain in-office ancillary services furnished within the same group practice are also exempted, provided that patients are given a list of alternative providers in the area who can furnish the same services. 42 U.S.C § 1395nn(b)(2).

---

[3] https://oig.hhs.gov/compliance/physician-education/fraud-abuse-laws/.

29.     The AKS makes it unlawful to "knowingly and willfully offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person ... to refer an individual to a person for the furnishing ... of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2). The term "any remuneration" encompasses anything of value, in cash or in-kind, directly or indirectly, covertly or overtly. 42 U.S.C. § 1320a-7b(b)(l). The AKS applies to all federal healthcare programs.

30.     Compliance with the Stark Law and the AKS is a condition of payment under federal healthcare programs. *See* 42 U.S.C. § 1395nn(g)(1); 42 C.F.R. § 411.353(c)(1), (e); 42 U.S.C. § 1320a-7b(g). As HHS explains, "[t]he fact that a claim results from a kickback or is made in violation of the Stark law also may render it false or fraudulent, creating liability under the civil FCA as well as the AKS or Stark law."[4]

31.     Medicare application forms both inform providers of the existence of the Stark Law and the AKS, and require that providers agree to comply with those laws. For example, clinics, group practices, and other providers apply to participate in Medicare using Form CMS 855B, which requires signatories to sign a Certification Statement that includes the following passage:

---

[4] https://oig.hhs.gov/compliance/physician-education/fraud-abuse-laws/.

I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in section 2A1 of this application. The Medicare laws, regulations, and program instructions are available through the Medicare Administrative Contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b) (section 1128B(b) of the Social Security Act) and the Physician Self-Referral Law (Stark Law), 42 U.S.C. section 1395nn (Section 1877 of the Social Security Act)).[5]

32. In addition to agreeing that this passage is correct, signatories must also certify that they have "read the contents of this application," thus ensuring that they cannot simply claim ignorance of the rules governing the submission of claims.

## GENERAL ALLEGATIONS

### I. The MVS Network

33. Dr. Samer Saiedy owns a network of medical businesses with locations throughout Maryland and Pennsylvania.

34. After running a group practice under his own name for several years, Dr. Saiedy renamed his practice Maryland Vascular Specialists.

35. Dr. Saiedy acquired an ownership interest in MVS Wound Care—a business founded by Relator in 2012 to provide hyperbaric wound care and treatment services, then called Hyperheal Hyperbarics—by purchasing shares from Relator in May 2013. The company eventually came under the control of Dr. Saiedy in or around June of 2015, and it was given the trade name of MVS Wound Care and Hyperbarics in or around June 2020.

---

[5] https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855b.pdf at 30-31. Individual practitioners, institutional providers, and others are required to make substantially the same certifications when applying to participate in Medicare. *See* https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/Enrollment-Applications.

36. Dr. Saiedy acquired MVS Podiatry in or around 2019.

37. Dr. Saiedy is the sole owner of Maryland Vascular Specialists, MVS Podiatry, and the MVS Podiatry ASC. Dr. Saiedy's current ownership interest in MVS Wound Care is the subject of a pending lawsuit between Relator and Dr. Saiedy, but Dr. Saiedy claims that he owns the vast majority of the company. It is undisputed that Dr. Saiedy controls and profits from MVS Wound Care. Relator has not been involved with the day-to-day operations of the company since 2018.

38. Maryland Vascular Specialists advertises that it provides "outpatient and surgical care and expert management of all vascular conditions such as aortic aneurysms, peripheral arterial disease (PAD), diabetic foot ulcers, leg ulcers, varicose veins, and venous disease, carotid artery disease and stroke prevention, chronic wound care, limb salvage, and vascular malformations."[6] MVS Wound Care touts its wound care services, including treatment using hyperbaric chambers (which involves the use of oxygen at high pressures), and its "multi-disciplinary team comprised of vascular surgeons, plastic surgeons, general surgeons, podiatrists, primary care doctors, nurse practitioners, and certified wound care nurses and hyperbaric technicians."[7] And MVS Podiatry advertises that it provides "medical and surgical treatment for disorders, conditions and injuries affecting the foot and ankle."[8]

39. Maryland Vascular Specialists has fifteen locations, with twelve in Maryland and three in Pennsylvania. MVS Wound Care has eight locations in Maryland (three of which—the Abingdon, Glen Burnie, and Westminster, Maryland locations—are in the same suite or building

---

[6] https://mvsdoctors.com/about-us/.

[7] https://hyperheal.com/about-us/.

[8] https://podiatryassociates.org/about/.

as Maryland Vascular Specialists locations). MVS Podiatry has sixteen locations (including the MVS Podiatry ASC), one of which is located in the same building as a Maryland Vascular Specialists office (in Havre de Grace) and one of which is co-located with MVS Wound Care (in Columbia).

40.     The MVS Entities are intended to be a "unified" and "integrated" network of businesses under the "MVS" name. For example:

a. To reflect the unification of the entities, Hyperheal Hyperbarics, Inc. changed its trade name to MVS Wound Care & Hyperbarics in or around July 2020.

b. Maryland Vascular Specialists has been described in Baltimore Magazine as having a "strategic partnership" with MVS Wound Care.[9]

c. Although Podiatry Associates, P.A. has not registered "MVS Podiatry Associates" as a trade name with the State of Maryland, it uses the same "MVS" branding as Maryland Vascular Specialists and MVS Wound Care. For example, its website and LinkedIn page display its name as "MVS Podiatry Associates."[10]

41.     The unified branding of the MVS Entities can be seen in their logos:

  

---

[9] https://www.baltimoremagazine.com/directory/doctor/maryland-vascular-specialists/.

[10] https://www.linkedin.com/company/mvs-podiatry-associates; https://podiatryassociates.org/.

42.     Dr. Saiedy is listed as a provider on the website of Maryland Vascular Specialists,[11] but is not listed as a provider on the websites of MVS Wound Care[12] or MVS Podiatry.[13]

43.     Most physicians employed by the MVS Entities have privileges at each of the MVS Entities, such that each MVS Entity can bill for the services of many (if not most) of the physicians employed by any MVS Entity.

44.     The MVS Entities submit bills for payment to federal health programs, including Medicare, Medicaid, and TRICARE.

## II.     The Self-Referral Scheme

45.     Dr. Saiedy has implemented a fraudulent scheme by which MVS Network physicians (including himself) improperly self-refer patients to other entities within the MVS Network for the furnishing of designated health services, as that term is defined in the Stark Law, including for services that are ultimately paid by Medicare and other federal health programs.[14]

46.     These self-referrals are not mediated through an independent provider without a financial interest in the practice to which the patient is referred.  When a primary care provider refers his or her patient to see a specialist, and that specialist determines that the patient needs to see yet another provider that has a financial relationship with the specialist, the specialist might avoid a Stark Law violation by sending the patient back to the independent primary care provider to render an independent referral, rather than directly referring the patient to the related entity. Defendants, however, do not want patients going back to their primary care providers, which

---

[11] https://mvsdoctors.com/physicians/dr-samer-saiedy/.

[12] https://hyperheal.com/our-team/.

[13] https://podiatryassociates.org/ ("Our Providers" dropdown menu).

[14] Designated health services provided pursuant to these referrals include at least clinical laboratory services, durable medical equipment and supplies, outpatient prescription drugs, and inpatient and outpatient hospital services.

11

would risk losing the patient to another provider as a result of the primary care provider's independent exercise of judgment. In order to continue to control the patient (and to ensure that he can profit from that patient's medical needs), Dr. Saiedy and the MVS Entities skip this step, and instead directly refer patients to the MVS Entities.

47.     Furthermore, according to testimony from an employee of the MVS Network (discussed below), Defendants do not provide MVS patients with options of providers outside of the MVS Entities. Nor, on information and belief, do Defendants inform the patients of Dr. Saiedy's common ownership interest in the MVS Entities.

48.     Defendants' fraudulent scheme has continued since when Dr. Saiedy first acquired an interest in MVS Wound Care in 2013, although the volume of referrals has almost certainly increased in recent years given Dr. Saiedy's acquisition of MVS Podiatry and the significant increase in the number of locations of the MVS Entities.

49.     Dr. Saiedy enforces the fruition of this scheme through threats of retaliation. Because MVS Network physicians are employees, Dr. Saiedy is able to threaten them with adverse employment consequences if they refuse to refer patients to other MVS Entities or do not produce a satisfactory volume of referrals. Dr. Saiedy often calls physicians who are failing to produce sufficient referrals to berate them. Upon information and belief, there is at least one MVS Entity physician who suffered adverse employment action after he questioned Dr. Saiedy's practice of self-referrals.

50.     Dr. Saiedy also incentivizes this fraudulent scheme using monetary inducements. Specifically, he knowingly offers remuneration in the form of bonuses to physicians based on the volume of patients they refer within the MVS Network.

51. To hide the fact that these referrals violate the law, Dr. Saiedy and the MVS Entities affirmatively alter patients' records to make it appear as if patients' primary care managers are making those referrals.

52. The following table summarizes specific instances of patients who were referred from Maryland Vascular Specialists to MVS Wound Care for hyperbaric treatments that were billed to Medicare:

|  | Dates of Service | Number of Hyperbaric Treatments | Amount Collected from Medicare by MVS Wound Care |
|---|---|---|---|
| Patient A | 1/13/2014 - 4/25/2014 | 60 | $19,658.40 |
| Patient B | 5/19/2014 - 8/8/2014 | 55 | $18,020.20 |
| Patient C | 6/9/2014 - 9/4/2014 | 60 | $19,658.40 |
| Patient D | 7/2/2014 - 10/24/2014 | 31 | $10,156.84 |

53. Additionally, according to records possessed by Relator, the following Medicare-insured patients were given unlawful self-referrals in violation of the Stark Act in 2020 and 2021:

    a. one patient referred from MVS Podiatry to MVS Wound Care;

    b. two patients from MVS Podiatry to Maryland Vascular Specialists to MVS Wound Care; and

    c. three patients from Dr. Saiedy to MVS Wound Care.

54. It is very likely that each one of these patients was billed for more than a single visit at MVS Wound Care. Relator estimates that each patient accounts for approximately twenty different visits.

55. According to former employees of the MVS Network and others to whom Relator has spoken since his departure from MVS Wound Care, this conduct is ongoing and the scheme continues to grow in scope.

56.     Dr. Saiedy has profited significantly as a result of this scheme. Relator does not know the exact profits attributable to this scheme, but is aware that Dr. Saiedy has been able to accumulate significant wealth. For example, Dr. Saiedy is the owner of Long Beach Marina in Baltimore, a recently expanded restaurant, multiple other non-medical companies, a multi-million dollar yacht, and many other assets.

### A.    Information about the Fraud Scheme from Former MVS Network Employees

57.     At least two former employees of the MVS Network—Heidi Benge and Hank Meyers—have confirmed under oath (in connection with state court litigation between Relator and Dr. Saiedy that is unrelated to this case) that these improper referrals were taking place, as discussed below.

58.     Ms. Benge, a registered nurse who worked at MVS Wound Care starting in 2019, explained in an affidavit that "Dr. Saiedy regularly referred patients back and forth between" MVS Wound Care and Maryland Vascular Specialists. She testified that on Tuesdays, Dr. Saiedy would call MVS Wound Care and refer patients (Ms. Benge explained that this practice was referred to in the office as "Dr. Saiedy Tuesdays").

59.     Ms. Benge noted in particular one patient who was referred from Maryland Vascular Specialists to MVS Wound Care for hyperbaric treatment. Three days after the patient began treatment, Ms. Benge and another staff member were contacted by Taryn Nelson, the practice manager of MVS Wound Care, who informed them that they needed to amend all of the patient's treatment notes to remove Dr. Saiedy's name and to make it appear as if the patient's primary care manager was the referring physician. Ms. Nelson told Ms. Benge that she "was never to list Dr. Saiedy as the 'referring doctor' for any patient he referred to" MVS Wound Care. She also testified that patients at MVS Wound Care made vascular referrals only to Maryland Vascular

Specialists, and that patients of MVS Wound Care were not given any other options for vascular medical services.

60.     Ms. Benge also noted that she raised her concerns about these practices to upper management (including Michael Gendreau, Dr. Ziad Mirza, and Rhonda Connor) numerous times, only to be ignored. In or about June 2020, Ms. Benge resigned from MVS Wound Care based on her concerns about unlawful activity and unsafe practices.

61.     Mr. Meyers, a hyperbaric technologist who worked at MVS Wound Care from 2012 to 2019, explained in an affidavit that he "had numerous patients show up from Maryland Vascular Specialists . . . with a referral in-hand that listed Samer Saiedy, MD as the referring physician, but I was instructed not to enter his name into [MVS Wound Care's] electronic records system as such." He was instructed by Amber Dorn (an administrative staffer at MVS Wound Care), Ziad Mirza (Chief Medical Officer at MVS Wound Care), Taryn Nelson, Larry Abramson (who held executive positions at both Maryland Vascular Specialists and MVS Wound Care), and Michael Gendreau (who held executive positions at both Maryland Vascular Specialists and MVS Wound Care). Mr. Meyers noted that these instructions accounted for "hundreds, if not thousands" of patient "dives" (*i.e.*, hyperbaric treatment sessions) for which Dr. Saiedy should have been, but was not, listed as the referring physician. Mr. Meyers also testified that the volume of improper self-referrals increased exponentially subsequent to the federal government investigating MVS Wound Care for other improper billing practices (unrelated to those alleged in this Complaint). Notably, upon information and belief, the investigation did not involve the self-referral aspect of the fraudulent scheme alleged herein.

## B.     Relator's First-Hand Knowledge of the Fraud Scheme

62.     Relator, who is the founder of MVS Wound Care and worked there until early 2018, has first-hand knowledge of this scheme. He has personally witnessed Dr. Saiedy send patients

from Maryland Vascular Specialists to MVS Wound Care. He has also examined records that demonstrate that these improper self-referrals were taking place.

63.     Relator also learned about this scheme in a one-on-one conversation with Dr. Saiedy on January 3, 2016. Relator and Dr. Saiedy were dining together at Thai One On or San Sushi Too in Towson, Maryland (the two restaurants occupy the same building). Relator recalls that this meeting took place on Dr. Saiedy's birthday. The topic of referrals came up, and Relator asked Dr. Saiedy how these referrals within the MVS Network were possible given the federal prohibition on self-referrals. Dr. Saiedy response indicated that he had started using MacPractice (an electronic medical records program) and hired Scott Hughey (who had previously worked with MacPractice) so that the MVS Entities would be able to alter the medical records so that they would not reflect Dr. Saiedy's self-referrals. Relator recalls Dr. Saiedy saying of his self-referral practice: "We don't want hospitals getting the business. No one will ever know."

64.     Although Defendants altered underlying medical records to make it appear as if referrals were rendered by independent providers, Relator believes that a review of the MVS Entities' records will likely reveal that patients are being seen by a different provider within the MVS Entities only minutes after their first appointment, making it impossible that those patients' primary care providers (who are likely listed as the referring physician in the medical records) actually independently approved the referral and gave the patient options.

65.     Relator is aware of at least 3,000 occurrences of patient visits pursuant to wrongful self-referrals from in or around March 2013 to 2016 from the Lutherville and Glen Burnie locations of Maryland Vascular Specialists to MVS Wound Care. Given the steady and substantial increase in the number of locations (and patients) of both Maryland Vascular Specialists and MVS Wound

16

Care, as well as the acquisition of MVS Podiatry, the number of unlawful self-referrals per year has almost certainly ballooned.

66.     Relator estimates that 70 percent of the MVS Networks billed are paid by Medicare, and a small portion (under 5 or 10 percent) are paid by Medicaid or TRICARE.

67.     Relator estimates that Defendants have billed more than $50 million to the federal government pursuant to this fraudulent scheme.

**C.     Two Sub-Types of Improper Referrals**

68.     Although Defendants' self-referral scheme described above is unlawful in its entirety, Relator notes two specific sub-types of unlawful self-referrals that are particularly egregious: (1) referrals made without a genuine medical need, and (2) referrals made to take advantage of reimbursement rate differentials.

**1.     Referrals Made without a Genuine Medical Need**

69.     Dr. Saiedy's aggressive promotion of self-referrals leads to MVS Network physicians making referrals for patients who do not need the treatment for which they are referred.

70.     For example, Ms. Benge testified in the state proceeding referenced above that Dr. Saiedy berated a doctor at MVS Wound Care who would not perform hyperbaric evaluations on patients referred by Dr. Saiedy, because those patients were not appropriate candidates for hyperbaric treatment. Such patients were nonetheless seen by MVS Wound Care.

71.     Mr. Meyers also testified in the state proceeding referenced above that patients who had no business receiving certain treatments were being self-referred to the MVS Entities simply for the sake of billing.

### 2. Referrals Made to Take Advantage of Reimbursement Rate Differentials

72.     Additionally, Defendants' self-referral scheme allows them to take advantage of the higher reimbursement rates that ambulatory surgical centers receive under federal health programs, even when a patient could receive the same care at a different MVS Entity.

73.     Except for the MVS Podiatry ASC, each of the MVS Entities is categorized by Centers for Medicare & Medicaid Services ("CMS") as an "Office" under place of service code 11. MVS Podiatry ASC is an "Ambulatory Surgical Center" under CMS place of service code 24. Federal health programs often pay more for services when they are billed by an Ambulatory Surgical Center than when they are billed by an Office

74.     Dr. Saiedy and various employees of the MVS Entities also regularly refer patients to MVS Podiatry ASC to take advantage of the higher reimbursement rates paid to Ambulatory Surgical Centers. Many of these referrals are simply "on paper," such that those patients are never physically seen at the MVS Podiatry ASC location. In other words, the MVS Entities are simply arbitraging the different reimbursement rates available under different CMS place of service codes in order to enrich themselves and Dr. Saiedy. Patients receive the same service.

75.     Relator was told about this practice by employees of the MVS Network.

## III.    Additional Allegations of Defendants' Scienter

76.     Defendants are aware that these practices are unlawful.

77.     As alleged above, Defendants falsified their records to make it appear as if patient referrals came from unaffiliated physicians rather than from physicians employed by the MVS Entities. Defendants would not have manipulated their medical records in this way had they not known that self-referrals within the MVS Entities violated federal law.

78.    Furthermore, Dr. Saiedy knows that direct referrals from one MVS Entity to another run afoul of the law, because his attorney informed him of this fact by email on June 3, 2013. Specifically, Dr. Saiedy was told by an attorney that referrals to facilities he owns must be initiated by an independent physician who exercises independent medical judgment and determines that the treatment is necessary. Dr. Saiedy was also specifically told that "it would not comply with the law" for Dr. Saiedy to refer a patient to an entity that he owns without referring the patient back to his or her own internist "to determine for himself that the treatment is necessary."

## IV.    False Certifications

79.    Throughout all of this, Defendants have falsely certified (both expressly and impliedly) to the government that they were in compliance with the Stark Laws.

80.    On information and belief, Defendants have submitted application forms to allow them to participate in federal healthcare programs that require them to certify their compliance with federal law, including but not limited to the Stark Law and the AKS.

81.    Dr. Saiedy also told the federal government in or around 2016 that he instituted a "compliance and integrity" program to ensure the MVS Entities' compliance with federal law.

82.    Even had Defendants not expressly certified their compliance with the Stark Laws, they impliedly certified compliance. A party impliedly certifies compliance when it submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose noncompliance with a statutory, regulatory, or contractual requirement and renders the representations about services provided misleading by that omission. Defendants did exactly that when they submitted claims for payment for services rendered pursuant to prohibited referrals and prohibited kickbacks, but failed to disclose that fact to the government.

19

As discussed above, compliance with these laws are a prerequisite to payment by a federal healthcare program.

## V.    The Allegations in This Complaint Have Not Been Publicly Disclosed, and in Any Event Relator Is an Original Source

83.    Neither the allegations in this Complaint nor any substantially similar allegations or transactions have been publicly disclosed in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or from the news media.

84.    The allegations in this Complaint (as well as substantially the same allegations) have not been disclosed "in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party." 31 U.S.C. § 3730(e)(4)(A)(i). Although Relator has been involved in private litigation in federal and state court with Dr. Saiedy and MVS Wound Care about trademark and shareholder rights issues that are not related to this case (and although some witnesses have discussed the issue of the MVS Entities' self-referrals), neither the government nor its agent is a party in any of that litigation.

85.    The allegations in this Complaint (as well as substantially the same allegations) also have not been disclosed "in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or ... from the news media." 31 U.S.C. § 3730(e)(4)(A)(ii)-(iii).

86.    Even if Defendants' unlawful referral scheme had been publicly disclosed within the meaning of the FCA (and it has not been), the information in this Complaint is independent of and materially adds to those references.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF 31 U.S.C. § 3279(a)(1)(A)
### Knowingly Presenting False Claims for Payment
### (Against All Defendants)

87.    Relator incorporates by reference the preceding paragraphs as if set forth fully herein.

88.    Each Defendant knowingly presented, or caused to be presented, false and fraudulent claims for payment for designated health services furnished pursuant to referrals prohibited by the Stark Law and the AKS.

89.    Dr. Saiedy has implemented a scheme by which he directs physicians and others within the MVS Network to refer patients to other MVS Entities for designated health services as that term is defined under the Stark Law. The MVS Entities then bill the federal government for those designated health services rendered pursuant to those referrals.

90.    Dr. Saiedy has a financial relationship with each of the MVS Entities in the form of an ownership interest.

91.    Dr. Saiedy directs MVS Entities and its staff and physicians to make such referrals and controls the referrals made by the MVS Entities' staff and physicians, and the MVS Entities comply with his directions by doing so. Dr. Saiedy also personally makes such referrals within the MVS Network.

92.    Dr. Saiedy enforces this scheme using both threats and improper bonuses to physicians based on the volume of referrals they provided.

93.    Dr. Saiedy also directs the MVS Network's staff and physicians to alter records and otherwise hide the fact that these self-referrals are taking place.

94.     Each MVS Entity submits bills to federal healthcare programs (including Medicare, Medicaid, and TRICARE) for services rendered pursuant to these self-referrals.

95.     Those claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were true. Defendants are aware that these bills are submitted pursuant to unlawful self-referrals and kickbacks.

96.     Compliance with the Stark Law and the AKS is a condition of payment under federal healthcare programs. On information and belief, the MVS Entities certified to the federal government their compliance with federal laws.

97.     The United States was not aware of the falsity of Defendants' claims, and Defendants' noncompliance with the Stark Law was material to the United States' decision to pay the claims submitted by Defendants.

98.     As a result of Defendants' conduct, the United States has sustained damages in an amount to be determined at trial.

## COUNT II
### VIOLATION OF 31 U.S.C. § 3279(a)(1)(B)
### Knowingly Making or Using False Records or Statements Material to False Claims
### (Against All Defendants)

99.     Relator incorporates by reference the preceding paragraphs as if set forth fully herein.

100.    Defendants made, used, and caused to be made or used, false records and statements in order to have their claims approved by the United States despite their violations of the Stark Law and the AKS.

101.    The false records and statements include false certifications and representations of compliance with the Stark Law and the AKS.

102. The false records and statements also include falsified medical records to make it appear as if patient referrals did not violate the Stark Law and the AKS.

103. Dr. Saiedy has implemented a scheme by which he directs physicians and others within the MVS Network to refer patients to other MVS Entities for designated health services as that term is defined under the Stark Law. The MVS Entities then bill the federal government for those designated health services rendered pursuant to those referrals.

104. Dr. Saiedy has a financial relationship with each of the MVS Entities in the form of an ownership interest.

105. Dr. Saiedy directs MVS Entities and its staff and physicians to make such referrals and controls the referrals made by the MVS Entities' staff and physicians. Dr. Saiedy also personally makes such referrals within the MVS Network.

106. Dr. Saiedy enforces this scheme using both threats and improper bonuses to physicians based on the volume of referrals they provided.

107. Dr. Saiedy also directs the MVS Network's staff and physicians to alter records and otherwise hide the fact that these self-referrals are taking place.

108. Each MVS Entity submits bills to federal healthcare programs (including Medicare, Medicaid, and TRICARE) for services rendered pursuant to these self-referrals.

109. Those claims were presented with actual knowledge of the fact that the statements and records were false, or with reckless disregard or deliberate ignorance of whether or not they were true. Defendants are aware that these bills are submitted pursuant to unlawful self-referrals and kickbacks.

110.    The United States was not aware of the falsity of Defendants' records and statements, and the Defendants' false records and statements were material to the United States' decision to pay the claims submitted by Defendants.

## REQUEST FOR RELIEF

WHEREFORE, Relator requests that the Court enter judgment in his favor and against Defendants as follows:

a.  The Defendants must cease and desist from violating the FCA;

b.  That Defendants must pay an amount equal to three times the total amount that it billed the United States in violation of the FCA;

c.  That Defendants must pay the maximum civil penalty for each violation of the FCA;

d.  That Relator be awarded the maximum amount allowed pursuant to 13 U.S.C. § 3730(d);

e.  That Relator be awarded all costs and expenses incurred in bringing this action, including attorneys' fees; and

f.  That the United States and Relator receive all such other relief as the Court deems just and proper.

## REQUEST FOR RELIEF

Relator demands a jury trial on all claims so triable.

Dated: December 10, 2021

Respectfully submitted,

Jeffrey David Katz

Jeffrey David Katz (Fed. Bar No. 17071)
JDKATZ, P.C.
3 Bethesda Metro Center, Suite 500
Bethesda, Maryland 20814
Tel: (301) 913-2948
Facsimile: (301) 951-0147
Email: jeffrey@jdkatz.com

Bruce D. Bernstein (*pro hac vice* to be filed)
Saul Cohen (admission application pending)
DICELLO LEVITT GUTZLER LLC
1101 Pennsylvania Ave N.W., Suite 300
Washington, D.C. 20004
Tel: (202) 975-2288
Fax: (202) 558-0799
bbernstein@dicellolevitt.com
scohen@dicellolevitt.com